## Vinton's Appeal.

1. Where a corporation sells part of its original franchise and property, and distributes the proceeds of the same, as a dividend, among its stockholders, said dividend will be regarded, as between a life-tenant and remainderman of part of the stock, as capital and not as income.

2. The St. L. Gas Company was incorporated with an exclusive right to supply gas to the city of St. L. The owner of certain shares of stock in said company transferred the same to a trustee in trust to pay over all issues, profits and dividends accruing therefrom to A. for life, and at her death to transfer said shares to B. Some years after, the said company became involved in litigation with another gas company as to its exclusive right to supply the city of St. L. with gas. It finally compromised this litigation by transferring to said other company the exclusive right to supply a certain part of the city of St. L. with gas, and also all its pipes, mains, etc., in said portion of said city. Said pipes, mains, etc., had been originally paid for, partly from the capital stock, and partly from the earnings of the company. In consideration of said transfer the St. L. Gas Co. received the sum of $650,000, which its directors proceeded to distribute in the shape of a dividend to its stockholders. *Held*, that the amount received by the trustee for A. and B. on account of the said dividend belonged to the capital of the trust estate, and should not be distributed as income to the life-tenant.

3. The rule laid down in Minot *v.* Paine, 99 Mass. 101,—that cash dividends are to be regarded as income, and stock dividends as capital,— disapproved.

January 24th 1882. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT, and GREEN, JJ.

APPEAL from the Court of Common Pleas No. 3, of *Philadelphia county:* Of January Term 1881, No. 254.

Appeal by Mrs. Sarah Vinton from a decree of said court dismissing her exceptions to the report of an auditor appointed to audit, settle and adjust the account of the Pennsylvania Company for Insurance on Lives, &c., trustees for said Sarah Vinton, under a certain deed of trust, and confirming the report.

The facts were as follows :—By indenture dated May 19th 1856, James Martin assigned and transferred to the Pennsylvania Company for Insurance, &c., one hundred shares of the capital stock of the St. Louis Gas-Light Company, then standing in the name of the said James Martin as trustee for Mrs. Sarah Vinton, in trust, " to receive all issues, dividends and profits accruing therefrom, and to pay over the same to Sarah Vinton during her natural life, to and for her sole and separate use," &c., and " at the death of said Sarah Vinton, to transfer said stock to Frederick Vinton, or his legal representatives."

Dividends were received from time to time, on said stock, by the trustees and by them paid over to Mrs. Vinton. On

[Vinton's Appeal.]

May 23d 1873, the, trustees received from the company a cash dividend of $4,995 which they paid over to Mrs. Vinton.

Before the auditor of the trustee's account, counsel for Frederick Vinton objected to the credit claimed in the account for such payment, on the ground that the so-called dividend of $4,995 was capital and not income. The facts as shown before the auditor were these :—

The St. Louis Gas-Light Company was incorporated by Act of the General Assembly of Missouri, approved February 4th 1837, to manufacture and sell gas in the city of St. Louis and vicinity. Section 23 of said act vested in the company the " sole and exclusive privilege of vending gas-lights and gas fittings in the city of St. Louis and its suburbs to such persons or bodies corporate as may voluntarily choose to contract for the same." Section 24 authorized the company " to lay pipes, conduits, &c., in any of the roads or avenues of the suburbs, and in any of the streets or alleys of the city of St. Louis." The company was also authorized to contract with the city of St. Louis for the lighting of the city with gas.

By an indenture dated January 8th 1841, and a supplement dated January 9th 1846, the company made a contract with the city corporation to light the city with gas ; and the city corporation undertook to grant and confirm to the company " the sole and exclusive privilege of lighting the streets, alleys, wharves, public buildings, and other public places of St. Louis, and of providing and furnishing the fittings and materials of all kind necessary."

Owing to the large growth of the city of St. Louis, its corporate limits were from time to time extended, so as to include what were formerly suburbs.

Subsequently, on March 7th 1857, the Laclede Gas-Light Company was incorporated by the General Assembly of Missouri, with power to make, manufacture and vend gas " within all that portion of the limits of the city of St. Louis not embraced within the corporate limits of said city, as established by the Act of February 8th 1839," and to lay down mains, pipes, &c., for that purpose, " and to have the sole and exclusive privilege and right of lighting the same."

Meanwhile, difficulties arose between the St. Louis Gas-Light Company and the city of St. Louis as to the contracts of 1841 and 1846, the latter refusing to pay for the gas under the contracts, and claiming that it was an illegal contract.

The Laclede Company began to construct its works, and to lay down its mains in the portion of the present city as authorized by its charter, and claiming that it had the exclusive right, under its charter, so to do, and denying the exclusive rights claimed by the St. Louis Gas Company.

The result of these rival claims was litigation.

Finally, in 1873, a compromise was effected, which was consummated by a tripartite agreement executed by the city of St. Louis, the St. Louis Gas Company, and the Laclede Gas Company, dated February 28th 1873, whereby the St. Louis Gas Company "waives, abandons and forever surrenders to the city of St. Louis, irrevocably, any and all claims and pretence of claims of exclusive right to have gas works, lay or have pipes or other appliances, vend or furnish gas, or do business as a gas company," in a certain part of the city of St. Louis; and covenanted with the city and the Laclede Company, that it would not, within said district assert any claim or right to hinder or prevent any one from making gas, laying down pipes, &c., in that district. The Laclede Company, in like manner, abandoned any exclusive right and claim or pretence of claim of sole and exclusive privilege of lighting, making gas, &c., in any part of the city.

It was then agreed between them, that the Laclede Company should furnish gas to the district north of the southern line of Washington avenue, being more than one-third of the whole city territory, and the St. Louis Company should occupy the rest of the city, and furnish the gas there.

The city agreed to pay, within two years, the overdue gas-bills to the St. Louis Gas-Light Co., which amounted to nearly $600,000.

In consideration of this contract the Laclede Gas-Light Company agreed to pay the St. Louis Gas-Light Company $650,000; and the St. Louis Gas-Light Company sold and delivered to the Laclede Gas-Light Company, all its mains, pipes, connections, lamps, lamp-posts, brackets, meters and all other of its property and effects which are situated and being within all that portion of the city of St. Louis north of the southern line of Washington avenue.

The said pipes and other property of the St. Louis Gas-Light Company within the territory above mentioned, were originally paid for by the St. Louis Gas-Light Company, partly from the capital stock of the company, and partly out of the earnings of the company.

On the first day of March, 1873, the Laclede Gas-Light Company executed their note for $650,000, the amount to be paid to the St. Louis Gas-Light Company for said property and privileges, payable on or before the first of May, 1873.

At a meeting of the directors of the St. Louis Gas-Light Company, held April 23d 1873, the following resolution was adopted: Ordered, that if the money to be paid "by the Laclede Gas-Light Company, shall be paid by the 3rd or 5th of

[Vinton's Appeal.]

May next, the president and secretary are directed to have a dividend of $600,000 entered on the books of the company, and to cause private circulars to be sent to the respective stockholders informing them of the amount of dividend then standing to their credit, and to pay the same on demand."

Accordingly, after the payment of the said note by the Laclede Gas-Light Company, $50 per share was paid in accordance, with the above resolution, and the accountants received the sum of $4,995, being the amount awarded to the 100 shares of stock of the St. Louis Gas-Light Company held in trust by them of the $600,000, received by the last named company of the Laclede Gas-Light Company.

It was in evidence before the auditor that the stock of the St. Louis Gas-Light Company sold at $156 per share, six months before the $600,000 dividend was declared, and that on June 30th 1873, being about a month and a half after the said dividend was paid, the stock sold for $170 per share.

There was no evidence to show what was the intrinsic value of the stock, by the company's books, before and after the said dividend was declared.

This dividend of $4,995, of May 13th 1873, differed from ordinary dividends in this : the former was a division of the proceeds of a sale of pipes, lamps, lamp-posts, brackets, meters, &c., and the privilege of lighting the district of the city named in the tripartite contract, while the latter were declared out of the earnings of the company for every six months. In declaring dividends of the latter character the usual form of the resolutions of the board was as follows : "Resolved, that a dividend of $6.00 a share be declared out of the earnings of the company for the last six months ending November 30th payable on and after the fifteenth day of December next."

The auditor reported that, in his opinion, the said dividend of $4,995 is a portion of the corpus of the trust estate, and not "issues, profits and dividends accruing from said stock" within the meaning of the provisions of the deed of trust ; and that said trustees are required to retain the said sum as principal, invest the same according to law, paying the income received therefrom to Sarah Vinton during her life, and after her death to Frederick Vinton or his legal representatives. The auditor therefore surcharged the accountants with the said sum of $4,995.

Exceptions filed by Mrs. Sarah Vinton to the auditor's finding were dismissed by the court, FINLETTER, J., filing the following opinion :—

"The St. Louis Gas Company sold their claim to the exclusive right to furnish gas to about one-half of the city of St. Louis, together with the pipes, lamps, &c., for supplying the

gas, for $650,000; which sum they divided among their stock-holders as a dividend. Was this dividend profits or capital? The company sold a part of their franchise, a part of their business, and a part of the machinery necessary to carry on that business, and make the franchise available and valuable.

"The capital of a company is not merely the value of the shares. Everything which is necessary to carry into effect the purposes of the company is capital. Even when profits assume this character they become capital, and cannot be treated as profits, nor can they cease to be capital. Capital is necessarily a homogeneous whole. If this were not so, it might be converted piecemeal into profits or something else, and be extinguished.

"In a gas company, surely, the right to supply gas, and the pipes and lamps by which it is supplied, must be regarded as capital, as much as the building in which the gas is manufactured. Even if it were shown that the whole $650,000 were paid alone for the pipes and lamps, and that they were purchased by the profits, their character as capital is not changed. When profits are used to extend enterprises of this kind, they become capital as much as when they are used to purchase raw material. The fund in controversy was, therefore, properly distributed by the Master as capital.

"The exceptions are dismissed, and the report confirmed."

Mrs. Sarah Vinton thereupon took this appeal, assigning for error the decree dismissing her exceptions and confirming the auditor's report.

*George Junkin*, for the appellant.—The dividend in question was income and not capital of the trust estate, for several reasons. There is nothing to show that it represented the proceeds of the sale of the franchise, pipes, mains, &c., to the Laclede Company, any more than it represented the accumulated income due by the corporation of St. Louis for lighting the streets, which amounted to about $600,000, and which, by the agreement, the city was to pay within two years. The payment by the Laclede Co. enabled the St. Louis Co. to distribute this amount at once. The auditor inferred that it represented the former, and that it was the proceeds of a sale of a part of the franchise and capital, viz: the exclusive right to sell gas within a portion of the city. The company had no such monopoly to sell, for no legislative body has power to grant such monopoly by charter; but if they had such a monopoly, they did not, by the tripartite agreement, sell it to the Laclede Co., but surrendered it to the city of St. Louis. By the same agreement, the Laclede Co. abandoned its claim to an exclusive right as to the whole city. The company did sell to

[Vinton's Appeal.]

the Laclede Co. all its mains, pipes, lamps, meters, &c., in a certain portion of the city, which mains, &c., were paid for, partly at least, out of income. The auditor and court below fell into error in supposing that income once capitalized could never be again treated as income. On the contrary, when it is no longer required as capital, the company may, provided they do not impair the original capital, and do not injure creditors, again treat it as income, sell it, and again distribute the proceeds as a dividend. In this case, the capital of the company was not impaired; on the contrary, its market-value increased after the transaction. The earnings of a corporation are capital until divided. A dividend is that amount of capital which is officially declared to be unnecessary to the carrying on of its business. It may be that the wisest as well as the simplest rule is that adopted in Massachusetts, viz : to regard *cash* dividends, however large, as *income ;* and *stock* dividends, however made, as *capital :* Minot *v.* Paine, 99 Mass. 101; Daland *v.* Williams, 101 Mass. 571; in Re Hopkins's Trust, Law Rep. 18 Eq. 697. In case of an attempt by the corporation to divide corpus, the remedy of the remainder-man would be in equity, to restrain such illegal action. It should not be the duty of a trustee on receipt of any dividend, to ascertain at his peril whether it was declared out of earnings or capital of the corporation. In most cases, this would be impossible. Under the Pennsylvania rule, as established in Earp's Appeal, 4 Casey 368; Wiltbank's Appeal, 14 P. F. Smith 256 ; and Moss's Appeal, 2 Nor. 264, it is only his duty to ascertain whether the corpus of the trust estate, as it existed at the creation of the trust, is impaired by the dividend. And we have shown in this case that it was not.

*J. G. Johnson* and *Edward Shippen*, for the appellees.—At the time this trust was created the stock assigned in trust had a certain earning power, based on the property possessed by the corporation, and the monopoly claimed by it. Whether this monopoly was a lawful or an unlawful one is immaterial, as the state alone could impeach it if unlawful. The voluntary abandonment and sale of one-half of this earning power, was the real consideration for the $650,000; the sale of the pipes, &c. was but an incident. It cannot be that the portion of this fund belonging to the trust estate goes to the life-tenant as income, because if the corporation should sell the remaining half of its earning power that would, on the same principle, go to the life-tenant, and there would be nothing left for the remainder-man. The right of directors of a corporation to declare a dividend, whether out of capital or income, does not affect the respective

rights of a life-tenant and a remainder-man in respect thereto. It is impossible to ascertain how much, if any, of the earnings of the company since the creation of the trust, are represented in this dividend, and the only safe rule is to treat it all as representing capital unless it is clearly shown to the contrary.

Mr. Justice GORDON delivered the opinion of the Court, February 20th 1882.

The court below having ascertained, beyond doubt, that the money in controversy was derived, not from the annual earnings or accumulations of the St. Louis Gas Company, but from a sale of part of its franchise and permanent property, thought it ought, of right, to belong to the corpus of the trust estate, and thereupon refused to award it to the life-tenant. If we are to follow our own decisions as found in Earp's Ap., 4 Ca. 368 ; The Pennsylvania Co. *v.* Dovey, 14 P. F. S. 260 ; Moss's Ap., 2 Nor. 264, and Biddle's Ap. [ante, 278], the opinion in which was delivered by Mr. Justice MERCUR, but a few days ago, we must affirm this conclusion. All these cases are similar to the one in hand ; a gift of the income of stocks for life to one person, and the corpus over to another, and by all these we are instructed that in order to ascertain and settle the rights of these parties, we must endeavor to discover what is principal, or capital, as distinguished from earnings or dividends resulting from the use of capital.

More than this : following these authorities, we must go even farther, and capitalize, in favor of the remainder-man, the surplus profits which may have accumulated in the treasury of the corporation, prior to the date of the creation of the trust. The present case, however, does not carry us to this extent, for the money in controversy comes from a sale of a part of the original franchise and property of the gas company ; in fact, part of the very corpus represented by the stock shares which form the principal of the trust created by the deed of James Martin.

The charter of this company clothed it with powers and privileges, not only very extensive, but very valuable. By this charter it had " the sole and exclusive privilege of vending gas lights and gas fittings in the city of St. Louis and its suburbs," and it was also empowered to " lay pipes, conduits, etc., in any of the roads and avenues of the suburbs, and in any of the streets and alleys of the city." Also, by indenture of the 8th of January 1841, between the city and the company, the sole and exclusive privilege of lighting the streets, alleys, wharfs, public buildings and other public places of the city of St. Louis, and of providing and furnishing the fittings and materials of all kinds, necessary for that purpose. The result of these grants, and a careful use of them, was great prosperity to the company, and a corresponding rise in its stock. But this very prosperity

begat opposition and danger. The city refused to abide by its contract, and to pay up its dues. Another company sprang up, the Laclede, which disputed the exclusive right of the old company to the territory mentioned in its charter. This led to the tripartite agreement of February 8th 1873, between the city of St. Louis, the Laclede Gas Company, and the St. Louis Gas Company, by which, among other things, the latter company agreed to withdraw from about one-third or one-half of its former territory in favor of the Laclede, and also to sell to it all its mains, pipes, connections, lamps, lamp-posts, brackets, meters and all other of its property and effects situated and being within the territory from which it had agreed to withdraw.

In consideration of this sale and transfer, the Laclede Company agreed to pay to the St. Louis Company the sum of $650,-000. A dividend of $600,000, of this money, was ordered by the directors, and of this, $4,995 came into the hands of the Pennsylvania Co. as trustee of the one hundred shares of stock conveyed to it by the deed, or power of attorney, of James Martin. It is thus manifest that the money in dispute comes, not from the annual earnings of the company, but from a sale of part of its property ; part of that very corpus which the stock shares represent, and without which those shares have neither substance nor value. If, therefore, the life-tenant is entitled to this money, thus derived from the capital of this corporation, so, in the end, may she come to be entitled to the whole corpus of the trust. For the accomplishment of this result, it is only necessary that the St. Louis Gas Company should effect a sale of the balance of its property, and order a distribution of the money so raised among its shareholders. But, logically, the effect of such a doctrine is to defeat the whole object of the trust. Instead of securing for Mrs. Vinton a sure income for life, it gives her the principal to use at her pleasure, whilst the gift over to Frederick Vinton is wholly defeated.

A rule, such as this, which may operate disastrously on a large and important class of our trusts, we cannot agree to adopt. It is, indeed, true, as said by Mr. Chief Justice CHAPMAN, in Minot v. Paine, 99 Mass. 101, that the rule, which regards cash dividends, however large, as income, and stock dividends, however made, as capital, is a very simple and convenient one, and may relieve trustees and courts of much trouble, but it is certainly not one that commends itself for its justice and equity, neither does it at all regard the facts of a case like that of Earp's Appeal, or like the case in hand. To us, it seems like a bungling rule of law that, at one time, would give what is indisputably income to the remainder-man, and, at another, what is as clearly capital to the life-tenant. It is, however, enough for us that our own authorities repudiate such a rule. In the case last re-

ferred to, it was held, that dividends from a corporate surplus fund, accumulated before the testator's death, must be regarded as part of the stock forming the trust fund, whilst after accumulations, though distributed in the shape of stock, must be treated as income, and go to the life-tenant. In like manner it was held, in Wiltbank's Appeal, that the earnings, or profits, of the stock of a decedent, made after his death, were income, though put into the form of capital by the issue of new stock, and it was there said, that " equity, seeking the substance of things, found that the new stock was but a product, and was, therefore, income." So may we say in this case; equity seeking, not mere convenience, but the substance of things, finds the dividend, in controversy, to be part of the actual capital of the company; money raised by a sale of part of its original franchise and realty; that which its stock most specifically and directly represents, hence, it awards the product to him in whom the stock is finally to vest. Assume the contrary doctrine, and that which we have already pointed out may at any time occur; on a sale of the entire franchise and property of the gas company, with a like order by its directors for a distribution of the money so raised, the dividends must go, regardless of the equities of the parties, to the life-tenant, and nothing whatever be left for the remainderman. This might be very convenient for trustees and courts, for, as it would definitely close out the trust, there would be no further trouble about it; nevertheless, the justice of such a disposition of the trust would be more than doubtful. Again, this same doctrine which makes a cash dividend income, and a stock dividend capital, would often work with equal harshness upon the interest of the life-tenant. For corporate earnings might be retained for an indefinite length of time, and then be distributed in the shape of stock shares, which the rule contended for would at once pronounce to be capital, and thus would the beneficiary be deprived of his or her income.

Than this, far better is our Pennsylvania doctrine, admirably stated by our brother, Mr. Justice PAXSON, in Moss's Appeal, as follows:—" But where a corporation, having actually made profits, proceeds to distribute such profits amongst the stockholders, the tenant for life would be entitled to receive them, and this without regard to the form of the transaction. Equity which disregards the form and grasps the substance, would award the thing distributed, whether stock or moneys, to whomsoever was entitled to the profits."

Decree affirmed, with costs.

SHARSWOOD, C. J., and PAXSON and TRUNKEY, JJ., dissented.