# OHIO NISI PRIUS REPORTS

## NEW SERIES—VOLUME XIII.

---

CAUSES ARGUED AND DETERMINED IN THE SUPERIOR,
COMMON PLEAS, PROBATE AND INSOLVENCY
COURTS OF OHIO.

---

### APPORTIONMENT OF STOCK DIVIDENDS BETWEEN LIFE TENANTS AND REMAINDERMEN.

Common Pleas Court of Cuyahoga County.

HENRY C. MILLER AND SAMUEL C. D. JOHNS, TRUSTEES OF THE
ESTATE OF N. E. CHAPMAN, DECEASED, v. MORTIMER H.
MILLER ET AL.

Decided, May 10, 1912.

*Distribution—Where Stocks Placed by Testator in Trust—Increased
Enormously in Value Through Segregation of Surplus Earnings—
Widow and Son Made Beneficiaries for Life—With Remainder to
"Lawful Heirs"—Entire Proceeds Held to Belong to the Trust Fund
—Consideration of the Massachusetts and the American Rules as
to Distribution Between Life Tenants and Remaindermen—Wills—
Residence of Testator—Construction of the Phrase "Lawful Heirs"
—Evidence.*

1. In an action to construe a will the question of the competency of
witnesses will be limited to matters pertaining to the estate, without
regard to the fact that such witnesses may be interested adversely in the final distribution.

2. Where the question of the legal domicile of the testator is in doubt,
and it does not appear that at the time of his removal from Ohio
it was his intention to make his new home his permanent resi-

dence, and from the facts as presented the probate court might well have reached the conclusion that at the time of his death the testator was a resident of Ohio, the question as to his residence can not be subsequently raised in an action to construe the will, and distribution of the estate will be made under the laws of Ohio.

3. By the term "lawful heirs" as used in the will under consideration the testator referred to brothers and sisters of both his wife and himself as a class, and the gifts under his will were direct, and the distribution should be made among those living at the time of his own death and the death of his wife respectively *per stirpes*.

4. Representatives of life tenants are entitled on final distribution to receive that portion of the fund in the hands of the trustee which should have been distributed to the life tenants during their lives as income from the trust fund.

5. The apportionment of the proceeds from the sale and liquidation of what was originally the Latrobe Steel Works was made, not as earnings, but as the proceeds from sale of the entire assets and working capital of the company which eventually succeeded to the property and capital of the Latrobe Steel Works; and upon distribution of that part of said proceeds paid to the trustee of a deceased stockholder of the Latrobe Company, the entire amount will be treated as belonging to the trust estate, and not as income, and as between the remaindermen and representatives of the life tenants will be paid over to the remaindermen.

*Stearns, Chamberlain & Royan*, for plaintiffs.

*Westenhaver, Boyd, Rudolph & Brooks, Hoyt, Dustin, Kelley, McKeehan & Andrews* and *Little, McArthur & Dunnebake*, contra.

CHAPMAN, J.

The above entitled action was brought by the trustees for the purpose of obtaining a construction of the will of Nathan E. Chapman, deceased, who died January 13, 1893.

In general terms, the decedent's will provided that all of his estate of which he died seized should be held by the trustees, with power to sell, dispose of or collect all of said securities, and invest and reinvest the proceeds thereof, and, after paying expenses, to pay the entire net income from the estate to his wife during her life, and, if necessary in the judgment of the trustees, to use part or all of the principal for the care and support of his wife; with the provision that after the death of the

wife, the net income should be paid to the son, Harry E. Chapman, during his life; and after the death of this son without living issue, then the estate should go one-half to the lawful heirs of the testator and one-half to the lawful heirs of the testator's wife.

From the admissions of the pleadings and the evidence, it appears that the testator's wife, Fannie Chapman, made application for admission of the will to probate in Cuyahoga county, Ohio, and the same was thereafter admitted to probate.

The said widow lived until the 10th day of March, 1908, and the said son, Harry E. Chapman, died on the 17th day of November, 1910, without issue living at his death, but leaving a widow, Caroline S. Chapman, who is one of the parties defendant.

The testator, Nathan E. Chapman, had four brothers and one sister, namely, William H. Chapman, who died August 18, 1895; Nelson C. Chapman, who died December 1, 1896; Dana B. Chapman, who died November 22, 1865; Charles W. Chapman, who died March 10, 1884, and the sister, Mary E. Buckland, who died January 18, 1905.

At the death of the testator the two brothers, Dana B. Chapman and Charles W. Chapman, each had children living; and the two brothers and the sister who were living at the death of the testator each have left children living, or their representatives.

The testator's wife, Fannie E. Chapman, died leaving three sisters and one brother, and the children of one deceased brother, living at the time of her death. And at the death of the son in 1910, the living representatives of the testator were nephews and nieces or the children of nephews and nieces; and the living representatives of his wife, Fannie Chapman, were one brother and three sisters and the children of a deceased brother.

Four specific questions are propounded in the petition for answer by the court. The main question discussed in the argument was question No. 1. Upon question No. 2 there seems to be no disagreement among counsel. On question No. 3 there seems to have been no disagreement. I do not understand that

a question is now raised as to the fourth question propounded in the petition. The other questions have been raised by the answers and cross-petitions of the various defendants; and as to these, so far as the court finds necessary for determination, it will state its conclusions.

The first question raised for determination, and which was reserved at the time of the hearing, was the competency of the testimony of the witness H. C. Miller and his sisters, each of whom is a party, and all of whom filed no answers in the case.

It is apparent that, as claim is made by Wilberding, administrator de bonis non of Mrs. Fannie Chapman, and the Guardian Savings & Trust Company, as executor of Harry E. Chapman, to a large part of the assets in the hands of the trustees, the interest of Miller and his sisters, as individuals, and the different representatives of the life tenants, will be largely affected by the decision as to the distribution of the estate in the hands of these trustees; that the interests of these parties in the litigation are and would be adverse to each other under the provisions of Section 11495 of the General Code, if the suit was an action between them individually. It is also manifest that if the witness Miller had no interest individually, but only as trustee, he would not at least have any personal interest adverse to any of the parties.

The case is, therefore, an unusual one, so far as the competency of Miller is concerned. As trustee, he represents only the estate. Is it possible to limit the question of his competency to matters pertaining to the estate or should his testimony be used in the determination of all the questions arising on the pleadings?

The estate as represented by Miller, trustee, is not adverse to any of the parties. All of the assets are to be distributed to some one. The only question as to which Miller and his sisters and the representatives of life tenants are adverse arises out of the distribution of the estate. The trustee is in a position in the nature of a stakeholder asking to whom the fund shall be distributed. If the action was one brought by the representative of the life tenant against the trustees who had refused to

pay money to the representatives, claimed to be due the deceased life tenants, then the trustee as well as the claimant would probably be adverse under the rule in *Farley* v. *Lisey,* 55 O. S., 627. But the action is not of that nature. The estate or trustees are not resisting payment to the representatives of the life tenants any more than they are resisting payment to the living brother and sister, but merely asking the advice of the court as to the proper disposition of the assets in their hands. This is the sole issue so far as the estate is concerned. It is true that the decision will affect the individual rights of Miller and his sisters, and the right of the representatives of the life tenants, and all will be bound by the judgment entered in the case; but it does not seem to me that, as representing the estate, Miller, trustee, has any interest in or is an adverse party as to any one; and that, representing the estate, he was required to put before the court all the facts, and then let the court determine how and to whom the distribution shall be made. For this purpose, he is not within the spirit of Section 11495. The purpose of the statute is to protect the interests of the decedent against an adverse interest, represented by a living party. Here, so far as the representatives of the decedent life tenants are concerned, they are not adverse to the trust estate, but claim under it; and such claim is not resisted by the estate, but by other parties to the action only. The adverse interests are between the distributees entirely. Do such adverse interests between distributees render them incompetent? It seems to me not. The testimony of each is given for the purpose of enlightening the court upon the real facts upon which the construction of the will is to depend; and while these defendants have adverse interests, the estate has but one interest, and that is that the distribution shall be made in accordance with the intention of the testator; and upon this issue none of the parties hereto are adverse; and it seems to me that, in respect to this issue, they are all competent. If not incompetent so far as the estate is concerned, then they are not adverse parties because adverse to each other as to the distribution to be made of the estate.

I therefore hold that all the witnesses are competent, in order that the estate may put before the court all the facts, whether

such facts are obtained from one source or another, and whether the sources are interested adversely or not.

· The second question arises out of the fact that, for the last eight or ten years of the testator's life, he did not live in Ohio, and for at least the last seven years of his life he had roomed at the residence of Dr. McCollin. in the city of Philadelphia, Pa. It is therefore claimed that the testator's legal domicile was not in Ohio, but in Pennsylvania; and that, while ·his will was probated in Cuyahoga county, Ohio, yet such probate was not an original probate, but ancillary to that of the testator's real domicile in Pennsylvania. That neither in fact nor in law was the testator's domicile in· Ohio. That as a matter of fact, testator's domicile being Pennsylvania, this court should treat the probate in Cuyahoga county, Ohio, as ancillary; or, in determining the question of distribution, apply the law of the state of Pennsylvania as controlling and governing the distribution.

Two objections are made to this contention: First, that the will was in fact probated in Cuyahoga county as an original probate, and that the judgment of the court admitting the will to probate in Cuyahoga county can not be attacked in this proceeding. Second, that as a matter of fact the testator's domicile was not in Pennsylvania, but was in Cuyahoga county, Ohio.

· The facts as to the testator's domicile are about as follows: He and his wife had lived in Cleveland until about the year 1882, on Willson avenue, owning their home there. This residence had been a long-continued one. In the·year 1882 he had obtained employment with the B. ·& O. Railroad Company, and went to Baltimore, Md. At the time of departing to Baltimore he sold his home on Willson avenue,· and some of his household furniture. The remaining articles of household furniture were stored for a time, and then shipped to him at Baltimore. At that place he and his wife were living at a hotel,° and continued to do so as long as they resided in Baltimore. The furniture was not unpacked, but was afterwards reshipped to Cleveland, Ohio, and again stored here until the marriage of his· son ·in 1887, when all but a small portion of it was given to his son. Some articles, perhaps, were taken by him·to Philadelphia.

In 1884, or about that time, he obtained employment with the Midvale Steel Company, and removed to Philadelphia, where he and his wife went to room at the house of Dr. McCollin. With the exception of a single year, when he and his wife were in California, he continued to live at the home of Dr. McCollin until his death in 1893. At the home of Dr. McCollin he had one room furnished by Dr. McCollin, except as to some small articles which were furnished by the testator. He and his wife boarded across the street from the residence of Dr. McCollin, and never had any other home or residence during the time that they were in Philadelphia.

I do not find that the evidence justifies holding that he ever voted in Philadelphia, although something is said about it in one of the depositions. He did frequently refer to Philadelphia as his home, both in correspondence to his wife and in a memorandum diary kept by him during all these years. All his personal property, in the nature of investments and bank accounts, was sent to H. C. Miller from time to time in Cleveland. Both he and his wife returned to Cleveland frequently to visit friends and relatives; and in talks with them he frequently stated that he purposed to return to Ohio as soon as he had made sufficient money to take care of himself and his wife; and there are some declarations which tend to show that he expected to return to Cleveland. During part of this time he became employed with the Latrobe Steel Works Company, and was one of its original organizers; and after its organization he traveled for that corporation. It had its office in Philadelphia. There are no declarations, so far as the evidence shows, tending to prove that the testator at any time stated that he intended making Philadelphia his permanent residence. On the contrary, the testimony tends to show that his removal from Cleveland was temporary, and that his intention was always to return to Cleveland or to Ohio as his permanent place of domicile.

In 1891 he returned to Cleveland for one of his various visits, and on the 29th day of May he made and executed the will herein in question. In this document he describes himself as "Nathan E. Chapman, of the city of Cleveland, county of Cuyahoga and state of Ohio"; and further, in the last paragraph of

the will, he provides that if the trustees should die or fail to administer the trust, the probate court should appoint a successor or successors to said trustees, as provided in Section 5986 of the Revised Statutes of Ohio.

After his death his wife made application for the probate of this instrument, and stated therein that the testator was "late of Cuyahoga county, Ohio," and she herself at the end of the application states her residence to be Cleveland, Ohio.

I have somewhat briefly referred to the evidence, not so much for the purpose of expressing opinion as to this question of fact as to show facts upon which the probate court acted or is presumed to have acted at the time of admitting this will to probate in Cuyahoga county, Ohio.

The testator undoubtedly resided in Philadelphia during nearly all the last eight years of his life; but it does not appear that such residence was made with the intention of making it a permanent abiding place. In order to become a domicile, there must have been a removal from the former place of domicile with the intention of making the new residence a permanent residence, and without an intention of returning to the former domicile.

From all the facts, some of which I have recited above, it can not be claimed that the proof conclusively shows that the testator's domicile was in Philadelphia, Pa. Therefore the question was an open one as to such domicile, whether in Pennsylvania or in Ohio. Unquestionably the Probate Court of Cuyahoga County had a right to determine that question upon proper application being made to it. By Section 10604 of the General Code, "upon the death of any inhabitant of this state, letters testamentary shall be granted by the probate court of the county of which he was an inhabitant or resident at the time he died." The application by Mrs. Chapman to probate his will in this county, in the form it was made to the probate court, therefore brought to the attention of the court for decision at that time the question of whether or not he was an inhabitant of the state of Ohio. The court passed on the facts; and we must presume that all the facts which this court now has before it, and any other facts that might be presented upon that question, were

considered by the probate court when it admitted the will to probate. The statutes made provision for a contest of this question as to the domicile of the testator and the character of the probate (Section 10520, General Code). No such contest was made by any one. The court had jurisdiction to hear and determine, and it did hear and determine; and it granted the letters in this case as an original probate.

It seems to me, from the facts as they appear in the case, that the probate court might well have reached this conclusion. It is true that under Section 10604 and other sections of the code the court can admit a will to probate for other reasons than that the decedent is an inhabitant of Ohio; but the jurisdictional facts are then different, and the probate is founded upon an entirely different application and proof. Here the jurisdiction was based on the fact that the testator was an inhabitant of the county. No application was made for an ancillary probate, or for a probate of a foreign will. The court had ample opportunity to admit this will as the will of a deceased inhabitant; and that was the only form in which application was made to it at the time the will was probated; and we think that this can not now be questioned in a collateral action, first, because the question of admitting the will to probate as an original probate depended upon a disputed question of fact as to domicile, and that having been determined, such determination is final. *Scheuer* v. *Richmond*, 16 O. S., 455; *Boughton* v. *Schriver*, 18 L. R. A., 242; *Record* v. *Howard*, 58 Me., 225.

If this was an original probate, we are not concerned with what distribution might be required by the law of some other domicile. The question was not raised or decided in *Swearingen* v. *Norris*, 14 O. S., 424. It appears that it was admitted that the domicile of the decedent was in Pennsylvania, and our court held that the law of the place of domicile determined the devolution of personal property, no matter by what jurisdiction it is administered. What would have been the decision had the right to make original appointment of administrator been controverted, is not determined. In our case domicile is controverted, and the judgment of the probate court can not be attacked collaterally; therefore the distribution must be in accordance with the law of Ohio.

Without reciting the relationship between the heirs of the testator in particular, the next question that arises is as to how the distribution shall be made. As I have stated at the beginning of this opinion, the testator provided in his will that on the death of the son without living issue, ''then  *  *  *  it is my will that all my estate shall go one-half to my lawful heirs and one-half to the lawful heirs of my wife, subject to the following conditions:

''Should my son's wife survive both my son and my wife, then it is my will, that one-fourth of my said estate, shall still remain in trust, she to be paid by said trustees, the net income of said one-fourth, during the time that she remains the widow of my said son; and that the remaining three-fourths of my estate be then and there divided between my heirs and the heirs of my wife, as aforesaid; provided, however, that if my sister, Mary E. Buckland, should survive me, then it is my will that the share that she would receive at law should remain in trust, in the hands of my said trustees, she to receive the income therefrom during her lifetime, and at her death said share to be paid to and vest in her daughter and the heirs of her daughter, Maria. It is my will that no part of my estate shall ever go to my said sister's son, George. And provided, further, that the share that would go to Mary A. Solloway, sister of my wife, shall remain in trust during the lifetime of said Mary A. Solloway; she, during said time, to receive the net income from said share; and at her death, it is my will that said share should go to the other heirs of my said wife, excluding therefrom the children of the said Mary A. Solloway, it being my will that the said children of the said Mary A. Solloway shall inherit or receive no part of my estate. And provided, further, that the part of my estate which would go to Mitchell H. Miller, brother of my wife, shall be held in trust during the remainder of his lifetime, by said trustees, he to receive the net income therefrom, and at his decease, the same to go to his children. And it is my will, that in the event one-fourth of my estate shall remain in trust for the benefit of the wife of my said son, as above provided, then at her marriage or decease, as aforesaid, said one-fourth to be disposed of in the same manner provided above for said three-fourths.''

By the provision that after the death of his son without living issue, ''the estate shall go one-half to my lawful heirs and one-half to the lawful heirs of my wife,'' a contingent estate is

given to such heirs.   Whether it is a contingent remainder or an executory devise, it is perhaps not important to determine. It is clearly not a vested interest in the heirs.  The gift to the lawful heirs is itself dependent on a contingency.   There is no gift *in presenti*.   The enjoyment not only is postponed, but the contingency attaches to the gift itself.   There is an uncertainty as to the actual enjoyment, not an uncertainty merely as to the time of enjoyment.   Upon this question there can be little doubt on the authorities (*Richey* v. *Johnson*, 30 O. S., at 294-5).   The question then is, whether there is uncertainty also as to the persons who shall take when the gift actually comes into enjoyment. It is the contention of the children of William H. Chapman that the persons who are to take should be referred to the time that the estate vests; and all the other heirs of the testator contend that those who are to take shall be determined as to the time of the death of the testator.

It is conceded by all that the intention of the testator, as found in the will, must govern; and for this purpose the entire will must be construed together and effect given to all of its words and provisions.   This is the accepted rule of interpretation everywhere.   If there be doubt and ambiguity in the terms used by the testator, then resort may be had to rules of interpretation for the purpose of aiding or assisting in the determination of the testator's meaning (*Townsend* v. *Townsend*, 25 O. S., 477).   The words used by the testator in this instance are not free from abiguity.   He first says the estate "then  *  *  * shall go one-half to my lawful heirs, subject to the following conditions."   He then provides that in the event the son should leave a wife, one-fourth to be held in trust for her while she remains a widow, and the remaining three-fourths to be "then and there divided between my heirs and the heirs of my wife. Provided, however, that if my sister, Mary E. Buckland, should survive me, then it is my will that the share that she would receive at law should remain in trust, in the hands of the trustees, she to receive the income therefrom during her lifetime, and at her death said share to be paid to and vest in her daughter, Maria.  *  *  *  And  *  *  * no part of my estate shall ever go to my said sister's son, George."

If there had been no conditions attached, but a gift merely to lawful heirs, then, under the rule prevailing in England and Massachusetts, heirs would be determined as of the date of the testator's death, even though there be intervening life estates; and this seems to be the general rule in many other states. This, of course, is giving the natural and normal interpretation to the word "heirs" as being those persons who take at the death of a decedent.

Where the gift to heirs is directed or implied by the words "distribute," or "divide," or "make a sale and divide," without other words of gift, the rule in Ohio seems to be that the persons who answer the description of heirs at the time of distribution are the ones who are to take, that being the time that the estate vests in enjoyment. Where the devise is to lawful heirs, it is presumed that the testator meant the persons who would take under the statute of descent and distribution in cases of intestacy, and resort must therefore be had to those statutes to determine who shall take. 79 O. S., 358; 70 O. S., 57.

If the gift were to the "lawful heirs," without the conditions which follow, it might well be said that the testator, having exhausted his specific wishes, desired the estate to follow the course provided by law. But the conditions which follow show that the testator was not satisfied merely to let the law take its course; but in event the contingency happens by which the estate goes to lawful heirs, he then gives express direction as to how the shares given certain named heirs, both of himself and his wife, shall be enjoyed by them, viz., to his sister, Mary E. Buckland, in trust; and at her death said share to be paid to her daughter, Maria, to the exclusion of the son, George; and the share of Mary A. Solloway, sister of his wife, to be held in trust, to pay her the net income during her life, and that no part of it should go to the children of Mary A. Solloway, but on her death should be divided among the other heirs of his wife; and the part of the estate which would go to Mitchell Miller, to be held in trust; at his death, the same to go to his children. His intention to rely upon the statute of intestacy to determine who shall take any of the portions is therefore qualified. While the devise is "one-half to my lawful heirs," which, without

other words would give to each heir of equal degree a single share, yet the express desire of the testator is, that while his sister, Mary E. Buckland, shall take a single share, yet her son, George, should not have anything, but that Mary E. Buckland's share, if she did not survive the testator, should go to her daughter and the heirs of her daughter, Maria. The testator, therefore, seemed to have in mind that his brothers and sisters should take a share of the property. Then in the following clause he refers to the heirs of Mrs. Solloway, sister of his wife. He provides that her share shall go to the other heirs of his wife, and that her children should receive no part of the estate. And he further provides that the part of the estate which would go to Mitchell Miller shall be held in trust. The provision as to Mary E. Buckland, that "if she survive me," indicates that the testator had in mind this particular sister, and that she might not survive him, and he controlled the gift of her share. This would seem to make the gift to the daughter of Maria one of purchase, and not merely by representation. The same applies to the share of Mrs. Solloway.

It therefore appears that the testator has himself given a construction as to whom he had in mind under the term "lawful heirs"; and that is, brothers and sisters of both his wife and himself. It is true two of his brothers had long been dead, each leaving children alive; but the testator at his decease had two living brothers and one sister. His wife's brothers and sisters were all living at the testator's death. So it seems, taking the four corners of the will to ascertain his intention, that the words "lawful heirs," as used by the testator, were intended to describe his brothers and sisters and the brothers and sisters of his wife, unless there be found some reason contrary to or inconsistent with this interpretation. He has used the words "lawful heirs" to describe these brothers and sisters as a class whom he desired to take; and that they were the class he had in mind is clearly referred to in the later provisions; that he referred to the lawful heirs to ascertain who should take, and then proceeded to define how they shall take. This would seem to clearly indicate that he intended by the words "lawful heirs" the persons answering that description at his death. The words

"shall go to my lawful heirs" are dispositive; and while he provides that if his son leave a widow, such widow shall receive the income of one-fourth of the estate, and that the remaining three-fourths shall "be then and there divided," these are words of division; and if these latter words were the only ones directing or implying the gift, they might, under the rules in Ohio, refer the ascertainment of the persons answering that description to the date of the distribution, as in 79 O. S., 358; 19 O. S., 30; 38 O. S., 242. Yet these are not the words on which the gift depends, they being "shall go," the former words directing how the distribution shall be made among the class which the testator has already described as lawful heirs. He now particularly describes those among whom he controls the division, including some who might take by representation.

It is urged that the term "lawful heirs" is a technical term, and should be given a technical meaning, but this is not the rule in Ohio. In 33 O. S., 572, the widow was excluded, such being the testator's intention. In 38 O. S., 473, the widow was included in the term "heirs." In the former case the word "heirs" was held to include brothers and sisters, and exclude the widow. So in Ohio "heirs" has been held to mean any one who might take any estate, real or personal, on the death of the decedent, if the context of the will shows such intention.

Again, it is urged in our case that the widow and son were the testator's only heirs at his death; and if "lawful heirs" meant those who stood in that relation at the testator's death, only the son and wife would answer that description. This contention is also answered by *Jones* v. *Lloyd,* 33 O. S., 572, that if "heirs," as used by the testator, shows an intention to exclude the wife, then she is excluded and the word "heirs" is given its technical meaning. In our case, just as definite an intention, as I construe this will, is shown to exclude the son; and if I am correct in such interpretation, there is no rule by which he can not be excluded.

It is further urged that "lawful heirs" having reference to both his own and his wife's, must refer to a class of persons, and at a time when both himself and wife had heirs, and that time was the time of division. The son was the only heir of the

widow, and it is just as manifest that in referring to her heirs he excluded the son, as when he referred to his own heirs. And while the coupling of his heirs and her heirs in a division to be made at the same time might indicate that both classes of heirs should be ascertained at the same time, yet this is not conclusive if the context indicates a different date for ascertaining who are heirs. 13 Simons, 613.

My conclusion, therefore, is, that this is not a case where the gift is only implied from the words "divide the proceeds after the death of the life tenant," like *Richie* v. *Johnson*, 30 O. S., 288; *Barr* v. *Denney*, 79 O. S., 358; but the gift here is direct, and the direction "then and there be divided" is only an incident of the division of the gift already decreed by the former clause.

It therefore appears that the testator's intention, as appears by the will in the words "lawful heirs," was to refer to his brothers and sisters and the brothers and sisters of his wife; and that the division should be made among them who were living at his or her death, respectively, *per stirpes*, and the representatives of the deceased brothers and sisters taking the share that would have gone to their deceased ancestor if living, except where the will directs such shares shall not go to the son of Mrs. Buckland and the children of Mrs. Solloway. *Allison* v. *Allison*, 101 Va., 537.

The next question for determination arises upon the stock held by the testator at his death in the Latrobe Steel Works.

The Latrobe Steel Works was a Pennsylvania corporation organized in 1888, with a paid-up capital stock of $600,000. Of this stock the testator held 250 shares of the par value of $25,-000. In the balance sheet of September 30, 1892, some four or five months prior to the death of the testator, it appeared that it had increased its profit and loss account, from its organization to that date, $187,000. In what form this amount of increase in the assets of the company was, does not appear. Prior to that date the company had paid no dividends. In 1895, as shown by its profit and loss account September 30, the company had in that account $868,000; and if I am correct in my figures, its total assets at that time exceeded $1,500,000. On or about

May 20 of that year, for some reason which does not appear in the testimony, the Latrobe Steel Works, by its board of directors and with the consent of all its stockholders, sold its entire assets, plant, machinery, gas leases, gas wells, pipe lines, and other assets, to the Latrobe Steel Company for $1,200,000, to be paid in the capital stock of the latter company at the rate of two shares of the stock of the new company for one share of stock of the old company. All the stockholders consented to this sale, and each received the stock in that proportion. At the time of this sale the company had cash on hand amounting to about $7,000. In what form the other assets of the company were, does not appear, but presumably it was in its physical assets and accounts, except the cash mentioned. After this sale the Latrobe Steel Works went out of business; and while it does not appear that the corporation itself was dissolved, no further evidence has been given as to just what became of the old organization.

At this time also it appears that $300,000 of the capital stock of the Steel Company was used to purchase the capital stock of the Latrobe Steel & Coupler Company, a corporation organized under the laws of Illinois and doing business at Chicago. The Steel Company then engaged in business, and for the next ten years paid large dividends upon its capital stock. During the later years this dividend amounted to 20 per cent. per year.

In 1905 the Steel Company sold all its physical assets, plant and machinery to the Railway Steel Spring Company for $4,300,000. Of its assets at that time, it reserved from sale its cash balance, accounts, the stock of the Coupler Company, and materials on hand. The cash balance at that time, as shown by its profit and loss account, was about $2,126,219. There was some indebtedness, which, from the statement of its accounts, appears to have been about $789,900, leaving a cash balance, after the payment of this, of about $1,300,000. In what form the other assets were, does not appear.

In 1908 it sold the stock of the Coupler Company for $1,243,000 cash to the National Malleable Castings Co. So that it received for its total assets $8,549,250, after payment of debts and charges.

During the month of January, 1906, it distributed to its stockholders $6,000,000 in four distributions, each distribution made being equal to the face value of the stock held by each of its stockholders. Thereafter there was paid to each of its stockholders his proportional interest in the remaining assets; so that the trustees of the estate of Nathan E. Chapman received in all $287,000.

The question arises as to the nature of the transaction in 1895 and the transaction in 1905. The claim is made that a large proportion of the 250 shares received by the trustees in 1895 was income, and belonged to the life tenants, and was not part of the capital of the trust fund; and further, that in the distribution of the assets of the corporation under the proceedings in 1905, a large part, at least, of the cash on hand was earnings of the corporate property, and belonged to the life tenants, and not to the corpus of the estate.

Some further facts I will state when I undertake to state the application of the law as I understand it to the facts as they have been presented by the evidence.

On these facts, what are the rights of the parties? And here I assume, for the purpose of this decision, that the representatives of the life tenants have a valid right to receive such portion of the fund in the hands of the trustees as should have been distributed to the life tenants during their lives as income under the terms and provisions of the will.

On the part of the representatives of the life tenants, it is claimed that of the 500 shares of stock of the company received by the trustees in place of the 250 shares of the capital stock of the steel works, the larger part of the added 250 shares belonged to the life tenant as income; that the transaction was a constructive stock dividend; and that, under the rule of division between life tenant and the remainderman, established by the courts of Pennsylvania, the proportional interest of the testator in the assets of the corporation at his death determined the principal of the trust fund, and that the balance above that is income. By this rule, where a dividend is declared by the corporation, the court will determine and apportion the respective interests of the life tenant and remainderman in the divi-

dend; and this is so whether the dividend is a cash dividend or a stock dividend (*Earp's Appeal*, 28 Pa. St., 368). This rule has been adopted by various jurisdictions, with some modifications, notably, New York, Kentucky, Maryland, Iowa, which refuse to apportion the dividends declared by the corporation after the death of the life tenant, but give all to the life tenant. This rule is denominated by several of the text-writers the American rule, distinguishing it from the Massachusetts rule, which holds that cash dividends belong to the life tenants and stock dividends to the remainderman (*Minot* v. *Paine,* 99 Mass., 101; 12 L. R. Appeal Cases, 385. This rule prevails in Connecticut, Maine and Rhode Island.

These rules both profess to follow the intention of the testator where he has devised and bequeathed the profits, dividends, income or interest on shares to a person for life, with remainder over on the death of the life tenant.

Perhaps not much quarrel can be had with either interpretation if one adopts the reason advanced by the respective courts for their rule. The Pennsylvania rule proceeds on the assumption that the testator's intention is to capitalize his stock interest in the assets of the corporation as of the date of his death, and to segregate that amount from all future increase, in the value of the assets of the corporation; and all increase after his death, when declared as dividend, either cash or stock, the testator intended should go to the life beneficiary. The other rule finds the intention of the testator to be to preserve not only the interest of the testator as of the time of death, but the increased value of the investment shall be preserved to the principal; and only the cash dividend as and when declared by the corporation from its earnings should be paid to the life tenant.

While this may not be the exact statement of the reason for either rule, both profess to be founded on the intention of the testator.

The decision, therefore, has depended, in jurisdictions where the question has not theretofore been decided, upon the attitude which the court adopted as to the intention of the testator.

Both of these rules, however, apply to dividends declared by the corporation out of the profits or earnings made by the cor-

poration, whether in the form of a stock dividend or a cash dividend. All the courts agree that until a dividend has been declared, neither the life tenant nor the remainderman has any interest in the assets of the corporation which he can appropriate or control. The question can only arise when the corporation has acted; then the courts following the Pennsylvania rule will inquire whether it is a division of the earnings of the corporation, or whether a division of the corpus of the assets. If of the earnings, then those accruing after the death of the testator belong to the life tenant, and those accruing before are part of the corpus and belong to the remainderman. *Vinton's Appeal,* 99 Pa., 434.

The Massachusetts rule seems to reach the same point. If a dividend, cash or stock, be in fact a division of the corpus of the assets of the corporation, it will remain part of the principal of the trust fund.

A corporation may use its earnings and increase as the directors deem for the best interests of the company. It may use such increase, whether from earnings or other sources, in the enlargement of its plant or business to any extent the directors deem proper. It may be dealt with as capital or as profits. It may distribute its earnings among its stockholders, or, acting in good faith, it may appropriate them to the permanent uses of its business. With such discretion, no stockholder can interfere (*Gibbons* v. *Mahan,* 132 U. S., 549). The difficulty comes in determining whether the corporation has appropriated its earnings to capital, or whether it has treated it as surplus earnings and preserved its character as such. If the corporation has preserved the character of its earnings and profits, and then declares a dividend therefrom, either in the form of cash or of stock, then the American rule gives the dividend to the life tenant, and the Massachusetts rule determines arbitrarily according as the dividend is stock or cash.

This, I understand, represents the real difference between the rules. The form in which the corporation has treated its earnings on the books of the company does not necessarily conclude the determination. It might appear on the books as surplus, profits, contingent fund, or otherwise. If it is maintained and

preserved as a surplus or profit account, even though it may have been devoted to some of the purposes of the corporation, and a dividend declared, it is still earnings and income; but if it has been devoted to the permanent uses of the corporate business, it then belongs to the corpus of the estate, and on the division will belong to the principal of the trust fund. The question is, has the identity and character of the earnings been so preserved that the board of directors may appropriate part of it, or all, for the purposes of dividends? If the corporation has unmistakably appropriated its earnings to the permanent increase of its plant and business, notwithstanding the form in which it is carried on the books of the company, it becomes principal; and if then the corporation divides it, it is a division of principal, whether cash or stock. This seems to follow if it be granted that the corporation has the right to devote its earnings to increase of its plant and business. The Pennsylvania rule, or at least the Pennsylvania decisions, may perhaps capitalize the holding of the trust estate as of the date of the testator's death, and hold all increase—no matter whether held as a surplus fund or devoted to the permanent enlargement of the plant and business—to be profits or income; but this rule does not seem to obtain, so far as I can find, outside of Pennsylvania (79 Ct., 634). All the other states seem to recognize the right of the corporation to devote its earnings to the increase of its assets and the permanent enhancement of its capital, and thus to make earnings capital (*Hemenway* v. *Hemenway,* 181 Mass., 406; 79 Md., 545, at 556). Such permanent investment by a corporation in its business goes to enhance the value of the corpus of the assets; and, if divided, is a division of the corpus and belongs to the remainderman (*Kalbach* v. *Clark,* 133 Ia., 215). Any other rule arbitrarily prohibits any increased or enhanced value of the investment of the trust fund. Such an interpretation seems to be clearly contrary to the intention of the testator. The Pennsylvania rule itself seems to recognize that there may be increased value of the investment after the date of the testator's death, when it holds that the option to purchase new stock is an inherent right of the old stock, and goes to the remainderman. *Moss's Appeal,* 83 Pa. St., 264; 93 Ky., 257.

The will in our case gave the trustees power to sell the securities and reinvest the proceeds.  This seemed to contemplate that there might be an advantage to the estate to sell the securities, and that there might be an increase in the investment side of it; and from which larger income might be earned for the life tenants.  The will provided that only the net income was to be paid to the life tenants.  To follow the Pennsylvania rule, as I understand it, would prevent the increase in the testator's investment after his death; that as between the life tenants and the remainderman, notwithstanding the fact that the corporation has devoted its earnings and profits to the permanent uses of the company's business, the increase, on any division, would go to the life tenant.  It seems to me the authorities, outside of Pennsylvania at least, do not sustain this position, but recognize the fact that the corporation may devote its earnings to increasing its plant and business; and when it does so, the action of the company is conclusive, and it becomes a permanent appropriation of its assets, whether from earnings or otherwise, to the capital of the corporation.  On the other hand, the rule that if a corporation preserves the character of all or part of its earnings separate from its assets permanently devoted to the uses of the company, the right to the dividend will depend upon whether it is one from such a fund or whether from a fund created by the sale and distribution of the corporation's capital, seems to be correct.  *Heard* v. *Eldridge,* 109 Mass., 258.

In *D'Ooge* v. *Leeds,* 176 Mass., 538, at 563, the Adams Express Company case, the court say:

"The question is, what part of the property is held in the business as a fund to be used for the benefit of the business, and what part is permanently separated from the business and turned over to the individual proprietors as income to be spent?"

In *Hemenway* v. *Hemenway,* 181 Mass., 406, at 409, *supra,* where the corporation had reserved from a sale of its plant and business "treasury assets," and declared a dividend out of said assets, the preliminary vote of the directors having declared such assets to represent the "accumulated undivided profits," it was held that such dividend was income.  It was contended

for the remainderman that this was merely a method of making a sale of the entire assets of the company, and that the reserve treasury assets were merely a part of the consideration received. The court say, page 409:

"We have assumed that if the real transaction was as contended, and if the dividend was made and paid as part of the consideration for the transfer of stock, the contention that it was principal, and not income, would be sound."

In *Second Church* v. *Colgrove*, 74 Ct., 79, where the company had set aside from the proceeds of the operation of its mines a sum exceeding its capital stock, and by concerted action of the directors and stockholders sold its stock and reserved such cash assets; *Held:* that the proceeding was substantially a liquidation, and that the dividend of such assets was capital. The purpose for which the reserve fund had been accumulated was, to purchase other mines after those worked had become exhausted. The corporation had accumulated the funds from its operations, which it still held for the purpose of its business; and prior to the sale such assets had been reserved for the permanent uses of the company. On the selling out of the stock holdings, the fund was still part of the corpus of the assets, and belonged to the principal of the trust.

In *Bulkley* v. *Society*, 78 Ct., 526, the corporation, with the consent of its stockholders, voted to discontinue its business, sell its plant and assets, except cash and bills receivable, to another company, in return for shares of the latter's stock. All the reserved assets were sold, and the proceeds paid to its stockholders. *Held:* this dividend or division belonged to the corpus of the investment. The claim was made by the life tenant, that the reserve assets represented surplus earnings, the proportional share of which belonged to him. The court say:

"These dividends were not passed by the directors of the corporation in the exercise of their discretionary powers in determining what of the corporate assets representing surplus should be separated and withdrawn from that body of them, to be retained for future corporate use, and, thus separated, go out to share owners as income free from all claim of the corporation thereon. There was no purpose on the part of the directors to

make a division of profits, as such, among the owners of shares which were to continue to exist. The company was engaged in liquidating its business and distributing all its assets to its stockholders. The end sought was the return to the owners of stock of all that the company owned, and its distribution to them in exchange or substitution for the shares which thereafter were to cease to exist. The directors were called upon to exercise no discretion. They had but a single duty, and that was to distribute everything in their hands, and they performed that duty as to cash and stocks in like manner. The company had ceased its operations as a going concern. The period within which dividends in the ordinary sense are made had passed. Its acts were only the necessary perfunctory ones attending dissolution. To quote the language of the Supreme Court of Massachusetts upon the subject of this very rule, as reported in the recent case of *Brownell* v. *Anthony,* 189 Mass., 442, 445: 'This language was used of corporations continuing in existence, and retaining their capital for the purpose of exercising their corporate powers. Obviously it has no application to dividends of the assets, made in liquidation of a corporation which has been or is to be dissolved.' "

In *In re Rogers,* 161 N. Y., 108, where a corporation sold its plant and raw materials to a new corporation, and received a large consideration to be paid in shares of the stock of the new company, and divided the shares among the stockholders of the old company in proportion of ten to one, the court held that these new shares were part of the capital of the trust fund, and not income. The whole amount received as the consideration for the sale was treated as capital. The court also held, that, of the reserved assets, one hundred dollars per share, the par value of the old shares, should be held in the trust fund as part of the corpus of the estate, and the balance of the reserved assets was profits and went to the life tenant.

The reason for treating the part given to the life tenant as income appears to be, that the company had invested a large part of the reserved assets outside of its own business, and was not using it for any purposes of the business of the company. But the court intimates that if it had been found to be working capital, it would have followed the corpus of the assets on a liquidation sale.

In *In re Stevens,* 98 N. Y. Supp., 28, affirmed 187 N. Y., 471, on the sale by a corporation of its entire plant and business, regardless of the nature of the assets, and their sources, the court held that the proceeds of the sale, in the absence of a showing to the contrary, were capital and not income, following the Rogers case, 161 N. Y., 108.

How, then, stands our case in the light of these authorities? In September, 1892, four months prior to the testator's death, the assets of the steel works company had increased, as shown by the profit and loss account, $187,000 above the par value of its capital stock. In 1895, at the time of the sale to the Latrobe Steel Company, as shown by its profit and loss account, the company had assets of $868,000 in addition to the par value of its capital stock, while the testimony of Mr. Smythe, the president of both the steel works and of the steel company, shows that this increase was from earnings; the balance sheet in 1895 shows that its cash on hand was about $6,900 at that time. Its real estate, machinery, tools, etc., amounted to $802,000. Just in what form the remainder of the assets was, does not appear. It, however, does appear that the corporation had at that time gas leases, gas wells, and a pipe line. The sale to the steel company of its assets was made with the assent of the stockholders. No separate schedule of the assets seems to have been made. They were of sufficient value to cover a stock issue of $1,200,000; and this stock, received as consideration, was issued to the stockholders of the old company in the proportion of two shares to one. Thereafter the old company did no business. For all that appears, all the assets sold by the old company to the new constituted its entire plant, machinery, real estate, working capital, and whatever assets it had used in carrying on its business. No dividend of any kind was declared. There was no division of earnings by the directors. It was a sale by the old company, with the consent of its stockholders, of the entire assets; and the proceeds of the sale, that is, the shares of stock of the new company received as consideration, were distributed to the stockholders of the old company. The transaction in 1895, therefore, seems entirely parallel with the facts in the Rogers case, 161 N. Y., 108, *supra,* so far as the distribution of the stock was con-

cerned. There were at this time no assets reserved from sale, and no money dividends, just as in the Rogers case.

How stands, then, the transaction in 1905? In that year the steel company sold its plant and works to the Railway Steel Spring Company for $4,300,000 cash. It reserved from the sale its cash balance, amounting to $2,126,219, its accounts and materials, and its holdings in the stock of the Coupler Company, of the par value of $300,000. There appears to have been some indebtedness at that time, which, as shown by the account attached to the deposition, ultimately amounted to $789,900. If this be deducted from the cash balance, it leaves about $1,300,000, which would have been the true cash balance. The corporation continued to hold the coupler stock until 1908, when it sold that stock for $1,243,000 cash. After 1905 the corporation did no business, except collect its accounts, settle its business, and make its sale of the coupler stock. The total proceeds of all its assets amounted to $8,549,250; and this amount was distributed in cash to its stockholders in proportion to their holdings.

In January, 1906, it distributed $6,000,000. This distribution was made up of its cash balance and the cash received from the sale of its plant to the Railway Steel Spring Company. The trustees of Nathan E. Chapman received during this month $200,000, in four payments of $50,000 each; and at later times, as the accounts were collected and the stock sold, they received $87,000 in addition. The difference between the value of the assets of the Steel Company between 1895 and 1905, Mr. Smythe, the president of the company, states was represented by the earnings of the company between those dates. No facts are given on which the witness bases this statement. It is, however, certain that payments made to the stockholders were not declared by the board of directors as being a dividend of surplus or earnings. The money received from the sale of the plant and the cash on hand was paid out to stockholders without regard to its sources. All was treated by the Steel Company as a single fund, and distributed to the stockholders as a part of the assets of the corporation, and the checks were marked ''on account of liquidation.'' Perhaps these words were not conclusive as to the facts of the transaction, but they were substan-

tially in accord with the facts. The company had sold the principal part of its assets and all of its physical assets, and no longer was engaged in any other business than the settling up and collection of its accounts outstanding, and the sale of the Coupler Company stock. This was substantially a liquidation in fact, whatever name we may give to it.

From the evidence it appears that all the cash balance on hand at the date of the sale to the Railway Steel Spring Company may have been used, and probably was used, as the working capital of the company. No part of its assets was invested or used in any other than the corporation's own business. It does not appear that any part of this cash had been wrongfully withheld from the stockholders. Dividends had been paid as high as 20 per cent. a year for some years previous to 1905. Neither does it appear but that all the cash balance and the increase in its assets had arisen from the natural growth of the business and such improvements and betterments as a business of such magnitude would normally acquire. Undoubtedly some part, if not the whole increase, arose from earnings; but the evidence tends to show that up to the sale in 1905, these earnings had been devoted by the directors to the permanent enhancement of the value of its plant, and used in the business and, consequently, had not been held and segregated in such form as that it can be said that they were held for the purpose of distribution as part of its earnings to stockholders. The final distribution was made, not as such earnings, but as the proceeds of the sale of its entire assets and working capital; and, under the authorities, on such a distribution, the payments belong to the trust fund, and are not income. *Bulkley* v. *Society, supra.*

The entire amount received by the trustees from the sale should be distributed, in accordance with the terms of the will, as part of the trust-estate.

Another question was alluded to in argument on behalf of the representatives of Fannie E. Chapman, to-wit, that no allowance was made to her from the estate of her deceased husband for a year's support.

No evidence has been introduced upon this question, and it appears that the estate of Nathan E. Chapman is still open;

and if her representative is now entitled to any such allowance, it can be made by the probate court on proper application and showing.

Holding the views just expressed, it is not necessary to decide whether the probate court had jurisdiction to appoint an administrator *de bonis non* of the estate of Fannie E. Chapman after the estate had been closed and settled and final account approved.