The remaining question presented is whether the life· beneficiary can act as trustee of this trust, so as to be entitled to commissions. The general rule is undisputed that a beneficiary of a trust cannot be at the same time a trustee; but it is also recognized that where other trust duties are devolved upon trustees than those which merely relate to the performance of trusts for the benefit of a beneficiary, the beneficiary can act as trustee for the others interested in the estate. This trust is personal property. The trustees are bound to hold it and preserve it for the benefit of those to whom it goes at the termination of the trust. There is thus an active duty imposed upon the trustees for the benefit of the remaindermen, and for their benefit the life beneficiary can act as trustee. Nor do I think that the question of the right of the life beneficiary to act as trustee is before us on this appeal. It appears that by the decree of the surrogate she was recognized as a trustee, and the trust property was turned over to her with her co-trustees, and she has performed the duties required of her as trustee. She would clearly be responsible to the remaindermen for any neglect in the performance of her duties as trustee, and is entitled to the compensation allowed for the performance of such duties. I think, therefore, that the life beneficiary is entitled to act as trustee for the benefit of the remaindermen, and as such is charged with an active duty of receiving and preserving the trust property and is entitled to commission as trustee.

The views before expressed will require a modification of this judgment, and ·the judgment is so modified, and, as modified, affirmed, with costs to all parties payable out of the principal of the trust. All concur.

---

(111 App. Div. 773)

### In re STEVENS et al.

(Supreme Court, Appellate Division, Fourth Department. March 7, 1906.)

1. TRUSTS—EXECUTION—CAPITAL AND INCOME.

Testatrix bequeathed certain corporate stock to her executors in trust to collect the "dividends, issues, and profits" thereof, and apply to the use of the beneficiary as often as they should be declared paid or released, until the beneficiary arrived at the age of 30 years, and then to transfer the stock to the beneficiary absolutely, and, if she died before arriving at such age, then remainder to certain grandchildren. Held that, on a dissolution of the corporation and sale of all of its assets, the value of the plant, equipment, and materials, betterments, good will, patents, patent rights, licenses, trade-marks, rights, privileges and franchises, and working capital constituted principal, and the invested surplus, surplus cash capital and accumulated surplus earnings constituted dividends, issues, and profits, as between the beneficiary of the trust and the remainderman.

[Ed. Note.—For cases in point, see vol. 47, Cent. Dig. Trusts, §§ 383–385.]

2. SAME—SINKING FUND—RIGHT OF REMAINDERMAN.

Where a trust estate consisted in part of certain bonds which had been purchased at a premium, and the remainderman, by investment of the capital of the trust, had derived a material benefit, consisting of a very large increase in the estate, he was not entitled to call on the life tenant to create a sinking fund from the income to make good the premium on the bonds which wore away as the bonds matured.

Appeal from Surrogate's Court, Chautauqua County.

Judicial settlement of the accounts of Frederick H. Stevens and another, as surviving trustees for Jesse Brooks Nichols and others under the will of Julia A. Brooks, deceased. From a surrogate's decree (95 N. Y. Supp. 297) settling the accounts, certain of the remaindermen appeal. Affirmed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, NASH, and KRUSE, JJ.

John Ewen, Clare A. Pickard, and Fred Greiner, for appellants.
Lewis & Montgomery, for respondents.

WILLIAMS, J. The decree should be affirmed, with costs to the trustees, the special guardian, and Jesse Brooks Tyler, payable out of the fund.

The testatrix made the will October 5, 1896, and died November 5, 1896. The will was admitted to probate November 16, 1896, and Stevens and Solano qualified as executors and trustees thereunder, and served as such. The former was a son-in-law, and the latter a daughter, of the testatrix. By the will (articles 8, 9, 10, 11, and 12) five trusts were created, each of 247 shares of the stock of the Brooks Locomotive Works, for the benefit of five grandchildren. The language of the five articles was precisely the same, except as to the name of the beneficiary. The stock was given to the executors in trust, to hold the same, collect the dividends, issues, and profits thereof, and apply to the use of the beneficiary, in semiannual payments, or as often as the same shall be declared, paid, or realized, until the beneficiary arrived at the age of 30 years, and then the stock with any accumulations or earnings thereon to be transferred to the beneficiary absolutely. If the beneficiary died before he became 30 years old, leaving issue surviving, the same to go to such issue; if there were no such issue, the same to go to the then surviving children and grandchildren of testatrix, they taking per capita and not per stirpes. These articles were subject to article 13 of the will, which provided that the executors should not be held liable for any depreciation in the value of the stock, and, while the testatrix wished the stock to be held so long as it seemed to the executors prudent to hold it, yet she authorized them to sell it and reinvest the proceeds whenever they deemed it prudent to do so, and they should not be held liable for any loss or depreciation in such investments, resulting from mistakes in judgment in making the same.

The Brooks Locomotive Works was organized by the husband of the testatrix in 1869. The capital stock was $250,000, in shares of $100 each, and has always remained the same. Mr. Brooks was, during his lifetime, the president and dominating spirit of the company. He died in 1887. At the time of his death the company was a prosperous business concern. A majority of the stock went to the testatrix when her husband died, and she assumed the control of the affairs of the company, which continued in a prosperous condition until her death, in 1896. The period of the company's greatest prosperity was, however, between 1896, when the will was made and the testatrix died, and 1901, when the company sold out and discontinued busi-

ness. At the death of the testatrix the value of the total assets of the company was $1,791,708.59; the value of plant and equipment being $748,152.43; and value of materials being $345,193.35; cash, bills receivable, etc.:

Invested surplus ..................................................... $418,492 50
Working cash capital ............................................... 279,870 31

$698,362 81

These figures make no account of the value of the good will, franchise rights, or dividend-earning capacity of the company as a going business concern. This was the property as it existed when the will was made and took effect at testatrix's death.

One of the questions involved in the case was how much of this amount constituted principal and how much "dividends, issues and profits," under the provisions of the will creating the trusts in question. What were the rights in the fund between the holders of the intermediate estates and the remaindermen? The surrogate held that the principal was the value of the plant, equipment, and materials, and its good will, patents, patent rights, licenses, trade-marks, rights, privileges, and franchises, called above plant, equipment, and materials, $1,093,345.78, and necessary working capital, $70,000, making a total of $1,163,345.78, and the balance being invested surplus, $418,492.50, and working cash capital, $279,870.31, less above, $70,000—$209,870.-31, making a total of $628,362.81, was "dividends, issues and profits," and this result is not seriously objected to here. It was, at all events, substantially correct.

From 1896 to 1901 the business increased largely. Three hundred and five per cent. in dividends were paid to the stockholders, and profits were made besides those dividends amounting to $1,424,034.82, which were undivided at the time of the sale hereinafter referred to, and a part of which had been invested in betterments and materials. June 20, 1901, the company sold its entire plant, equipment, and materials for $6,626,837, of which materials, supplies, product, finished or in process, patterns, drawings, and templates, were valued at $1,126,837; value of plant and equipment at death of testatrix, $748,152.43; expended for betterments since her death, $553,410.57; and the balance was $4,198,437, which covered all patents, patent rights, licenses, trade-marks, rights, good will, privileges, and franchises, and an agreement that the company should be wound up and dissolved and all capital stock turned over to the purchaser, and that the company and its officers should not for 10 years thereafter carry on the business of manufacturing locomotive engines. There was expressly excepted from the sale, cash on hand or in bank, bills and accounts receivable, stocks, bonds, leases, agreements, warrants, or other forms of invested surplus earnings. The sale was fully consummated, the company received the purchase price, and was itself finally dissolved October 30, 1903. After the sale there was paid and distributed to the stockholders, including the trustees under the will, as accumulated surplus earnings, $900,000, being those as found at testatrix's death, $628,362.-81, and those accumulated thereafter, $271,637.19.

There seems to be no controversy but that these payments were

properly made, and, so far as the trusts in question were concerned, were properly distributed to the holders of the intermediate estates. The main contention arises over the increase of the assets, or the value thereof, at the time of the sale in 1901. The principal at testatrix's death was $1,163,345.78. The sale was for $6,626,837. The increase was $5,463,491.22. This was made up of materials, $781,643.65; betterments, $553,410.57; and balance of $4,128,437. The question is whether this increase is to be regarded as principal or as "dividends, issues and profits." The surrogate decided it was to be regarded as principal and "accretions" thereto. It will be noted that there is no controversy now as to what the principal was at the time the trusts were created. Between that time and the discontinuing of business, however, the income of the company had increased, and large dividends had been paid, from time to time, which went to the holders of the intermediate estates, so far as the trust shares were concerned. Other earnings of the company were used to purchase additional materials and to make additional betterments. And there was, moreover, a large general increase in the value of the property itself, including among other things the good will of the business, which had not been considered in making up the "principal," as of the date of the creation of the trusts in question; and including also patents, patent rights, privileges, and franchises, the agreement to go out of business and dissolve the company, and not itself or its officers to carry on the same business for 10 years thereafter.

The words "dividends, issues and profits," used in the creation of the trusts, should be construed as meaning practically "income or earnings." The large balance of $4,128,437, covering good will, franchises, etc., can hardly be regarded as earnings or income. It was an increase in the value of the property itself, and such increase was in no proper sense a profit arising from or growing out of the stock which was the subject of the trusts. This principle was clearly enunciated and illustrated in Stewart v. Phelps, 71 App. Div. 91, 75 N. Y. Supp. 526, affirmed on opinion below, 173 N. Y. 621, 66 N. E. 1117. The terms of that trust were "rents, income, issues and profits," and they were held to give the intermediate beneficiary only the annual income, and not any increase in the value of the securities in which the fund was invested.

There is some reason to question the correctness of the surrogate's conclusion as to the other two items of materials and betterments. Those were the product of the surplus of yearly "income or earnings." The betterments had become a part of the property itself, the plant, and equipment. The materials were on hand and were simply materials, or in process of manufacture into locomotives. These amounts were to be distributed to the stockholders, not of a going concern, but of a company that had ceased doing business and had been closed up. Were they a part of the "principal" of the trust fund, or were they "income and earnings"?

In Matter of Rogers, 22 App. Div. 428, 48 N. Y. Supp. 175, and 161 N. Y. 108, 55 N. E. 393, there were some conditions very like those here involved. The company started in 1838 with a capital of $300,-000. Rogers died in 1868. The words used in creating the trust were "income or interest." During the continuance of the trust the

company paid 10 per cent. dividends semiannually. The business was very successful, large improvements were made in the plant, and large investments were made outside in bonds, stock, and real estate. In 1893 the whole plant, materials, and good will were sold for $2,-750,000, in the stock of a new company organized for the purpose of acquiring the property, and the old company went out of business. The old company had other property besides that sold, of the value of $3,000,000, and both these amounts, in all $5,750,000, were divided between the stockholders. The large increase in the property of the company resulted from accumulated and undivided profits and earnings of the company since its organization in 1838. The $3,000,000, at the time of the closing up of the business, was not being used in any way as active capital. It was invested in securities outside. In making a division of the fund, so far as the trusts were concerned, the $2,750,000 stock in the new company, issued to the stockholders in the old company, was regarded by the surrogate as capital, while the $3,000,000 of outside investments was regarded as profits or accumulated income. The Appellate Division and the Court of Appeals affirmed the surrogate. Clearly the moneys invested outside the business could not be regarded as capital. The amount received on the sale, however, was all held to be capital, including that for material, whether in process of manufacture or not, and the courts held this to be, in the absence of proof to the contrary, a part of the working capital, necessary to use in the business, and therefore capital, and not merely "income or interest." It was the product of accumulated, undivided profits, that had been made a part of the property itself, as necessary to the carrying on of the business, enlarged and extended as it had been. This decision is authority for holding the betterments and materials in this case a part of the capital or principal, rather than "earnings or income," so far as these trusts are concerned.

We have carefully examined the surrogate's opinion, and the briefs of counsel, and the various cases referred to by them, and must refrain from making any argument ourselves, or attempting to harmonize the apparent conflict in the decisions of the Court of Appeals. We conclude, upon the authority of the Rogers Case above, and upon a reasonable construction of the terms of these trusts, that the surrogate was correct in his decision in reference to this part of his decree. If we are wrong, the Court of Appeals can readily correct us.

The question as to a sinking fund, so-called, arises out of the consideration that there has been a decrease in the value of some bonds, in which investments have been made, by the wearing away of premiums thereon, to the amount of $9,158, and it is claimed this amount should have been provided for by reserving interest received thereon to meet this deficiency. This question has been held to be largely one of the intention of the testatrix, to be determined in each case upon the language of the will and the surrounding facts and circumstances. McLouth v. Hunt, 154 N. Y. 179, 48 N. E. 548, 39 L. R. A. 230; Matter of Hoyt, 160 N. Y. 607, 55 N. E. 282, 48 L. R. A. 126; N. Y. Ins. & Tr. Co. v. Baker, 165 N. Y. 484, 59 N. E. 257, 53 L. R. A. 544. The surrogate considered the question under this rule, and concluded that no sinking fund was required as to these bonds in question. We

have examined and considered his opinion and the briefs of counsel and the cases referred to therein, and see no reason to disagree with the surrogate's conclusion. There has been a very large increase in the estate by reason of the holding of the common stock of the new locomotive company, $2,750,000, and some preferred stock of the company, 13,000 shares, in which investments have been made. Perhaps this consideration has no real bearing upon the question of a sinking fund as to other securities, but it hardly seems in accordance with equity and equality to permit the remaindermen to retain the large increase realized upon some securities, and at the same time require the holders of the intermediate estates to contribute from their income amounts to keep the other securities good for their original purchase price, and the courts will lean towards an equitable and just disposition of these questions.

The decree should be affirmed, with costs, as hereinbefore suggested, payable from the fund. All concur.