[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The above-captioned case came before this court for a nonjury trial on the merits commencing on October 19, 1998. Before resting, the plaintiff withdrew the fourth and sixth counts of its Revised Second Amended Complaint.
The central issue is the claimed right of a mortgagee who has acquired a note and mortgage interest in a property to recover CT Page 13763 payments from an occupier of the property for occupancy at a time prior to the plaintiff's acquisition of the mortgage and note. The plaintiff mortgagee also claims that the defendant had a duty to pay real estate taxes both for the period of its occupancy and to cure arrearages of the prior occupant. The plaintiff seeks an order requiring the defendant to indemnify it for any claims that made be made against it in the future for environmental remediation.
The claims of the plaintiff in the remaining counts of the Revised Second Amended Complaint are as follows:
First Count — claim for compensation for the defendant's occupancy of the property from October 1992 to the present;
Second Count — claim that the defendant has been unjustly enriched by its occupancy of the premises from October 1992 to the present;
Third Count — claim that the defendant has committed waste by allowing an oil spill that allegedly decreases the value of the property;
Fifth Count — claim that the defendant has a duty to pay back real estate taxes from the charges originating on the October 1991 grand list to those originating on the October 1995 grand list;
Seventh Count — claim that the defendant, as the assignee of Fidelcor, is obligated to pay a license fee to the assignee of Connecticut Bank and Trust for use of the premises;
Eighth Count — claim that the defendant is liable by virtue of an inter-creditor agreements entered into between Connecticut Bank and Trust and Fidelcor to indemnify the plaintiff for any claims that may be asserted against it with regard to generation of hazardous waste resulting from operation of a block-making business on the site. The remedy sought in connection with this claim is specific performance of the agreement to indemnify.
The defendant has alleged as special defenses that the plaintiff lacks standing, has failed to state any cognizable claim, is not an assignee as to the rights it seeks to enforce, is estopped from asserting its claims, and has waived any rights to payment for use and occupancy. The defendant further claims as CT Page 13764 special defenses that the claimed inter-creditor agreement does not bind it since it was without knowledge of it and did not agree to be bound by its terms and that any claims for indemnification for losses resulting from assertion of liability against the plaintiff and speculative and not ripe for adjudication, no claims having been made.
The defendant has claimed a setoff from any liability for amounts it spent on repair, maintenance and capital improvements to the premises.
On the basis of the evidence presented, the court finds the facts to be as follows:
The plaintiff is the holder of a note and mortgage on industrial property at 99 Stoddard Avenue in North Haven.v The property consists of approximately twelve acres on which a large industrial building and some outbuildings are located. The note, dated May 29, 1987, is in the original face amount of $1.8 million. It is secured by an open-end mortgage and security agreement on the 99 Stoddard Avenue property and improvements. The note and mortgage now held by the plaintiff were originally granted in favor of Connecticut Bank and Trust Co., N.A. ("CBT") by the owner of the property, Plasticrete Block and Supply Corp. The CBT mortgage and note were assigned several times. The plaintiff acquired them for $303,000 from the FDIC, which acquired them upon the failure of CBT.
The defendant is the holder of a mortgage, junior to the plaintiff's mortgage, granted by Plasticrete to Fidelcor Business Credit Corporation on June 13, 1990, secured in part by the same property.
In October 1990, Plasticrete filed a voluntary petition for reorganization under Chapter 11 of the United States Code. In October 1992, the defendant moved on to the premises and began operating a concrete block manufacturing concern, having just purchased manufacturing equipment and other personal property of Plasticrete from Fidelcor, the creditor that held a security interest in that property. The defendant also acquired the Fidelcor mortgage; however, its occupancy of the property was not the result of any formal taking of possession as a mortgagee. The defendant did not commence a foreclosure action against Superior, nor did it seek a court order in any other proceeding authorizing it to occupy the property as a mortgagee in CT Page 13765 possession.
The defendant, an affiliate of a building materials supplier, was formed for the purpose of continuing production of concrete products that the affiliate had been obtaining from Plasticrete for use in fulfilling ongoing construction contracts. At the time the defendant moved on to the property, the bankruptcy trustee, Byron Yost, was in control of the premises in place of Plasticrete. The defendant intended to buy the property and undertook negotiations with the FDIC, which held the second mortgage at issue. As negotiations with the FDIC dragged on, the bankruptcy trustee negotiated the terms of a lease with the defendant, which had been occupying the premises rent-free under the expectation that it would soon buy the property. Yost sought approval of the unsigned proposed lease from the bankruptcy court, announcing his position that rents paid would be the property of the bankruptcy estate, to be applied to the claims of the unsecured creditors of Plasticrete. The FDIC opposed this position before U.S. Bankruptcy Judge Allen Schiff, asserting that the terms of the mortgage which it held (the mortgage now held by the plaintiff) entitled it to receive any rents paid. At that time, the FDIC had filed a foreclosure action in the Superior Court for the Judicial District of New Haven. The order granting relief from the bankruptcy stay that authorized the foreclosure action did not expressly state that the FDIC could move for appointment of a receiver of rents, and Yost took the position that only foreclosure, not access to the rents, was within the scope of the order.
Judge Schiff rejected this interpretation of the order and ruled that the terms of the mortgage included an inchoate right to the rents, which could be executed by filing a motion for appointment of a receiver of rents as part of the foreclosure action.
Since entry into the proposed lease had been contingent on approval by the bankruptcy court, the defendant did not sign the lease and the bankruptcy trustee abandoned any efforts to reach any agreement with the defendant and, in fact, abandoned the property, since he determined that there was no way to make it produce any income for distribution to the estate apart from the interests of the secured creditors. The FDIC did not move for appointment of a receiver of rents, nor, as far as the evidence presented indicated, did it pursue eviction of the defendant, which continued to hope to purchase the property that it was CT Page 13766 occupying.
In July 1995, an affiliate of the plaintiff was the successful bidder in a sale by the FDIC of the mortgage it had acquired from CBT. The affiliate assigned the mortgage and note to the plaintiff upon purchase. The plaintiff was aware when it acquired the obligations that the Town of North Haven had a superior lien on the property in the amount of $236,451 for unpaid real estate taxes. The plaintiff paid $303,000 for the obligations it obtained from the FDIC. At the time the plaintiff acquired these obligations there was neither a lease providing for payment of rent by the defendant nor any agreement to pay use and occupancy. Having been substituted as the plaintiff in the pending foreclosure action, the plaintiff successfully moved for appointment of a receiver of rents, Lexington Partners, LLC, whose representative, James Ainsworth, negotiated a use and occupancy agreement with the defendant. These negotiations, which began in the fall of the 1995, did not result in a signed document until May 13, 1996.
That document, titled "Amended Stipulation and Order" ("Stipulation"), was filed in the foreclosure action after the plaintiff had filed a motion to compel the defendant requiring the defendant either to enter into a lease or to pay use and occupancy. By the terms of the stipulation, the defendant agreed to pay the receiver of rents $4,000 per month for use and occupancy, plus $1,000 per month to be held in escrow for use for "capital improvements and major repairs" to the buildings, whose roofs and electrical systems were deteriorating. The stipulation provided for retroactive payments back to December 1995. It made no provision for any payments relating to periods of occupancy before December 1995. The receiver of rents did not seek any payments for the defendant's occupancy before December 1995.
A judgment of strict foreclosure was entered by the court,Celotto, J., on September 12, 1994. On October 15, 1995, there was an oil spill from the industrial building on the premises into the Quinnipiac River. On October 22, 1995, the plaintiff moved to extend the law days. That motion and several other motions to extend the law days have been granted, and the date of redemption had not yet occurred as of the date of the trial.
The defendant and its president, Ralph Crispino, have entered into an agreement with the federal authorities that remediated the spill to pay the clean-up costs. There was no evidence CT Page 13767 presented to indicate that the plaintiff has incurred any expense in connection with the oil spill.
The defendant has stopped its manufacturing operations on the premises and at the time of trial was in the process of moving out of the premises.
CLAIMS FOR RENT OR USE AND OCCUPANCY
In the first two counts of its complaint, the plaintiff seeks payment from the defendant for the fair rental value of its occupancy of the property from the time it began occupancy in 1992 to date.
The plaintiff claims that Section 1.07 of the CBT mortgage that it acquired by assignment entitles it to payment for the fair market value of the defendant's occupancy of the premises from 1992 on. That provision states as follows:
Section 1.07 Assignment of Rents
(a) The Mortgagor hereby assigns and transfers to the Mortgagee all the leases, subleases, franchises, rents, issues and profits of the Premises and hereby gives to and confers upon the Mortgagee the right, power and authority to collect such rents, issues and profits. The Mortgagor irrevocably appoints Mortgagee its true and lawful attorney-in-fact, coupled with an interest, at the option of the Mortgagee, at any time and from time to time, to demand, receive and enforce payment of, to give receipts, releases and satisfactions, and to sue, in the name of the Mortgagor or the Mortgagee, for all such rents, issues and profits and apply the same to the Indebtedness. . .
It is undisputed that from the time that the defendant began to occupy the property until the execution of the Stipulation in May 1996, there was no executed lease or any other kind of agreement requiring the defendant to pay either rent or use and occupancy. The plaintiff argues that the defendant's readiness to enter into the lease that the bankruptcy trustee proposed to the bankruptcy court should be regarded as binding the defendant. Since the lease was not approved, this argument absurdly suggests that the defendant is unilaterally bound to pay under an agreement into which the other party was not authorized to enter. Basic concepts of contract law preclude such a result. Klein v.Chatfield, 166 Conn. 76, 80 (1974) (a contract is not made so CT Page 13768 long as, in the contemplation of the parties, something remains to be done to establish the contractual relationship: in the case before the court, the remaining step was approval by the Bankruptcy Court, and approval was denied.)
The evidence does not establish that there were, at any time from 1992 to December 1995, any "rents, issues or profits" in existence as a result of the defendant's occupancy. There was no lease, and therefore no "rents." The plaintiff seeks not to collect the rents or issues or profits that existed, but rather to create, retroactively, an obligation by the defendant to pay rent or use and occupancy. At best, what the plaintiff seeks to enforce is the right of a mortgagor to payment for use of the premises, under an equitable theory of unjust enrichment or implied contract, since no actual contract or lease existed. The provision of the mortgage on which the plaintiff rests its claim does not include any such assignment of causes of action where the mortgagor itself has not established its entitlement by contract or otherwise to "rents, issues or profits."
Judicial rulings concerning the right of a mortgagee to rents where rents in fact are being generated pursuant to lease agreements suggest, moreover, that such a right applies only to the rents that accrue after the mortgagee has moved for appointment of a receiver of rents or has somehow taken affirmative action to collect such rents. "It is well settled that in Connecticut a mortgagor in possession of realty is entitled to the rents, with no duty to account to the mortgagee, unless and until the mortgagee asserts is right to collect the rents by taking an affirmative action to secure the rents from the mortgaged premises." In re Guay, 138 B.R. 3,4 (Bkrcy. D. Conn. 1992); In re Sansone, 126 B.R. 16, 18 (Bkrcy. D. Conn. 1991); In re Coniam, 9 B.R. 306, 309 (Bkrcy D. Conn. 1981). The application of these principles to the case before this court is not, however, as clear as the defendant suggests. The wording of Section 1.07 of the mortgage, cited above, distinguishes this transactions from those in which courts have ruled that the right to collect rents is the mortgagor's until some triggering event, such as default. The provision in the mortgage is, however, limited by its wording to "rents, issues and profits," and it does not include causes of action to establish an obligation to pay for use and occupancy.
Though the court has been unable to locate a discussion in Connecticut case law of the phrase "rents, issues and profits," CT Page 13769 in other jurisdictions that phrase has been held to apply to rents under existing leases or agreements, not to a right to claim use and occupancy in the absence of an agreement to pay rent. In People v. Gustafson, 127 P.2d 627, 632 (Cal. 1942), a California appellate court, after discussing the meaning of a California statute that a party claimed allowed recovery of payments for use and occupancy where there was no lease in effect, stated,
Furthermore, the phrase "rents, issues and profits" has a well understood meaning and refers to rents collected by the party in possession, and/or the profits accruing to him from said property, and not to the rental value or the value of use and occupation. Amberg v. Claussen, 186 Okla. 482, 98 P.2d 927; Smith. Howell, 91 Or. 279, 176 P. 805; Fifty Ninth St. Real Estate Co.v. Murphy, 95 Misc. 191, 159 N.Y.S. 203; In re Stevens, 111 App.Div. 773,98 N.Y.S. 28, 31; Equitable Life Insurance Co. v.Brown, 220 Iowa 585, 262 N.W. 124; Hopkins v. Remy, 64 N.J. Eq. 12,53 A. 676, 677; Oram v. Peirce, 73 N.J. Eq. 391,67 A. 1053, 1056, 54 C.J. Sec. 6, p. 3
Under Connecticut law, the owner of a mortgaged property is the mortgagor; Red Rooster Construction Co. v. River Associates,Inc., 224 Conn. 563, 569 (1993); and it is the owner that has the right to control the use of the land and to enter into leases,Milici v. Ferrara, 133 Conn. 141, 145 (1946), until a mortgagee enters into possession or a court grants a motion to appoint a receiver of rents. Summarizing Connecticut law, the federal bankruptcy court has noted that
 It is well settled that in Connecticut a mortgagor in possession of realty is entitled to the rents, with no duty to account to the mortgagee, unless and until the mortgagee asserts its right to collect the rents by taking an affirmative action to secure the rents from the mortaged premises.
Matter of Guay, 138 B.R. 3, 4 (Bkrtcy. D. Conn. 1992).
At all relevant times, the owner of the premises was Plasticrete. It did not exercise its right to seek equitable compensation for the defendant's use of its premises, nor did the FDIC take possession or move for appointment of a receiver while it held the CBT mortgage prior to July 1995. Since there was no lease or agreement to pay rent in effect, such that no "rents" CT Page 13770 existed, the plaintiff has standing under Section 1.07 of the mortgagee only as to claims for rent or use and occupancy arising after it acquired the mortgage and obtained the appointment of a receiver.
There is, moreover, authority in Connecticut to the effect that an assignee may recover rents only for the period following the assignment, and not arrearages from prior periods. HartfordRealization Co. v. Travelers Insurance Co., 117 Conn. 218, 229
(1933) (mortgagee does not acquire a right to rent in arrears under leases subsequent to its mortgage, but may collect only those rents due after the mortgagee takes possession.)
Even if the words of Section 1.07 were construed to extend to the right to pursue a claim for use and occupancy, the plaintiff has failed to provide a persuasive basis for determining damages. Case law concerning a different situation in which there has been held to be a duty to pay for use of a property in the absence of an explicit agreement is instructive. Where a tenant wrongfully holds over after the term of a lease and becomes a tenant at sufferance, the owner of the premises is entitled to damages for the unlawful retention of its property "consisting of the fair rental value of the property for the period during which the defendant remained in unlawful possession." Lonergan v.Connecticut Food Store, Inc., 168 Conn. 122, 130 (1975).
The plaintiff claims an alternative source of a right to recover compensation for the defendant's use of the property at issue: the intercreditor agreement entered into between CBT and Fidelcor. (Ex. 25). In that agreement, Fidelcor obligated itself and its assigns to pay a "license fee" if it occupied the premises. The use of the term "license fee" does not alter the fact that what the plaintiff is seeking as a result of the CBT-Fidelcor agreement is a payment for use and occupancy. It is unclear from the foreclosure proceedings whether this claim, as well as the claim founded on the mortgage itself, was actually assigned to the plaintiff, and, if it was, whether it was entrusted to the receiver of rents and must therefore be pursued, if at all, by the receiver as an appointee of the court. Even if it was not, the fact remains that the plaintiff has failed to provide this court with evidence that is both competent and persuasive on the issue of damages as to this claim.
"Fair rental value" is the prevailing market rental value for premises similar to the subject premiss during the period in CT Page 13771 question. Lonergan v. Connecticut Food Store, Inc.,168 Conn. at 131-32. That term defines the measure of damages for use and occupancy. Since the intercreditor agreement specifies no amount to be paid for occupancy, the term supplies the measure for damages under that claim as well.
The plaintiff did not present any witness to testify as to the fair market rental value of the property for the time periods at issue. The plaintiff claims that the rent set forth in the proposed lease that was rejected by the bankruptcy court was evidence of fair rental value. That proposal was, however, for a period of six months, with an option to renew, and the draft lease provided that it was terminable if a foreclosure action were filed. Such features indicate that the rent specified in it may have been the amount that a party already occupying the site was willing to pay for a very short term, during which, according to other evidence, it was trying to purchase the site and was operating a business dependent on bulky equipment not easily removed.
The circumstances of the negotiations do not support an inference that the terms set forth in Exhibit 16 represented the fair rental value, but only the very idiosyncratic result of bargaining by a uniquely situated party with concerns not indicative of the rental market in general. Superior Block was operating a business at the site and would have had to relocate that business precipitately if it had not come to terms with the court-appointed receiver. The business equipment on the site included heavy equipment needed for manufacturing concrete blocks, and the court infers that such an operation is not easily relocated. The defendant's situation was not indicative of the fair rental value but only of its own urgent circumstances, not of the market in general.
The plaintiff has, moreover, waived any right to assert that the terms of the Stipulation by which the defendant obligated itself to pay for use of the property for the period commencing in December 1995 are evidence of fair rental value. At paragraph 8 of that Stipulation, it was agreed that "Superior's agreement to pay the sums set forth herein shall not in any manner, or to any extent, be used to establish the fair market rental value of the rental, lease or use of the Property."
This court concludes that the plaintiff has not sustained its burden of proof with regard to its claim against the defendant CT Page 13772 for payments for use and occupancy for the period before December 1995. It has, however, established that the defendant failed to pay the rent agreed to in the Amended Stipulation and Order for the months of September and October 1998. The plaintiff is therefore entitled to recover of the plaintiff the sum of $10,000., which represents the two months of payments proven to be due under the Stipulation into which the defendant entered in May 1996.
LIABILITY FOR REAL ESTATE TAXES
The plaintiff claims that Superior Block had a duty to pay the real estate taxes imposed by the Town of North Haven over the years that the defendant occupied the premises. In its trial brief, the plaintiff provides no legal authority for this proposition, but merely observes that imposing such an obligation would be fair because Superior occupied the site. Connecticut law, however, provides that it is the owner of record that is obligated to pay taxes. Conn. Gen. Stat. Sec. 12-161. While another party may assume this obligation by contract with the owner, see Ives v. Addison, 155 Conn. 335, 340-41 (1967), the plaintiff has failed to prove that the defendant ever entered into any contract by which it assumed the duty of paying the real estate taxes. At most, the plaintiff has indicated that a draft contract would have imposed this obligation on the defendant; however, that draft was not approved by the bankruptcy court, and the defendant therefore never became obligated to pay the taxes.
The mortgage that Superior acquired by assignment obligated the mortgagor, Plasticrete, to pay real estate taxes (Ex. 39, p, 19).
Internal memos concerning the plaintiff's acquisition of the mortgage reveal that BRE was aware that the property to which the mortgage applied was encumbered by real estate tax liens superior to that mortgage (Ex. K, L). BRE evidently took the amount of the tax liens into consideration when it acquired this mortgage in the face amount of $1.8 million for about $300,000. Its attempt to shift the real estate tax obligation to a junior mortgagee is without legal basis.
NEGLIGENCE
The plaintiff claims that the defendant was a mortgagee in possession of the property and as such had a duty to protect the CT Page 13773 property from waste and is liable to it for damage to the property. The plaintiff claims that the defendant negligently allowed an oil spill from the premises into the nearby river and that this event will expose the property to a lien for environmental clean-up. At the time of trial, the owner of the property continued to be Plasticrete, not the plaintiff, and it is by no means clear that the plaintiff, as a mortgagee, has standing to seek damages for harm to the property. Even if standing were assumed, however, the plaintiff has not proven that there has been any damage to the property.
The evidence was to the effect that oil escaped from the heating system into the river through a pipe, and that the clean-up was to the river. No evidence suggested that the incident resulted in an escape of oil into the soil or any damage to the property.
In its trial brief, the plaintiff argues that the possibility that a lien will be filed if the defendant fails to pay clean-up costs as agreed constitutes damage to the property. At the time of trial, no lien had been filed, and the plaintiff has not taken this claim of damage out of the realm of speculation.
INDEMNIFICATION AGREEMENT
Superior Block acquired from Fidelcor a mortgage junior to that held by the plaintiff. On June 13, 1990, Fidelcor had entered into an inter-creditor agreement with Connecticut Bank and Trust, which at that time held the mortgage now owned by the plaintiff. Fidelcor, which also had a security interest in Plasticrete's machinery, agreed that if it entered the premises for purposes of "repossessing, removing, selling or otherwise dealing with the Shared Collateral" it would "indemnify CBT for any liability CBT may incur as a result of any generation of hazardous waste in connection with the completion of any block-making which is accomplished under the supervision of Fidelcor while Fidelcor is in possession of the Real Estate." In Paragraph 4, Fidelcor also agreed "to pay CBT a license fee for its reasonable use and occupancy on a per month basis for its continued occupation of the Real Property" after the first four months. Paragraph 8 of this agreement states that "(A)ll terms, covenants and conditions herein contained shall inure to the benefit of, and be binding upon, the parties hereto, their successors and assigns." CT Page 13774
This court has discussed above the claim for use and occupancy based on the CBT-Fidelcor agreement.
With regard to the applicability of this agreement to the plaintiff's claims arising from the oil spill, the evidence did not establish that that spill constituted "generation of hazardous waste in connection with the completion of any block-making which is accomplished under the supervision of Fidelcor while Fidelcor is in possession of the Real Estate." Fidelcor did not agree in the letter agreement with CBT to indemnify it against any and all costs of environmental clean-up. The agreement was, instead, limited to "generation of hazardous waste" and only if such generation were "in connection with the completion of block-making" on the premises. The evidence presented indicated that the oil spill was caused by a leak from the oil supply for equipment that heated the water generator for the building. The only testimony that related to the equipment that is likely to have caused the release of oil is that it involved an oil heating system used to heat the building, not substances or processes that were present only because of making on the premises. No evidence linked the spill to the process of block-making.
Even if the indemnification obligation set forth in the CBT-Fidelcor agreement were seen as applying to the spill that occurred, the plaintiff has not presented any evidence that it has been caused at any time up to and including the time of trial to pay any costs of any kind resulting from generation of hazardous waste. In the absence of proof that it has incurred any liability for generation of hazardous waste, the plaintiff has no basis for asserting a claim for specific performance of an obligation to indemnify it under the terms of the Fidelcor-CBT agreement.
COUNTERCLAIM
The defendant has filed a counterclaim seeking reimbursement for expenditures it claims that it made to benefit the real property that secures the mortgage held by the plaintiff. In fact, many of these expenditures were made for the purpose of conducting the defendant's business. More fundamentally, however, the defendant has not identified any legal duty of the plaintiff, a mortgagee, to reimburse it for expenditures that the defendant did not prove that the plaintiff requested. The defendant characterizes its expenditures as giving rise to a cause of CT Page 13775 action in unjust enrichment. The defendant mistakenly characterizes that cause of action as existing wherever one party makes expenditures that benefit another party. In fact, an element of the claim is that the failure to compensate must be "unjust" under the circumstances. Weisman v. Kaspar,233 Conn. 531, 550 (1995); Hartford Whalers Hockey Club v. UniroyalGoodrich Tire Co., 231 Conn. 276, 282-83 (1994). The circumstances in the case before this court do not include any request by the plaintiff that the defendant make expenditures, nor any assurances that the defendant would be permitted to continue to occupy the premises. On the contrary, the defendant moved in while the owner of the premises was in bankruptcy, occupied the property without any formal arrangements, and based its efforts at preservation of the property on its own needs in conducting its business, not on the needs of the plaintiff.
The defendant has failed to prove the elements of a claim for unjust enrichment, and its counterclaim must fail.
CONCLUSION
The sole claim as to which the plaintiff has presented proof by a preponderance of the competent evidence is its claim that it is owed $10,000. for unpaid rent for September and October 1998. The defendant has failed to prove its counterclaim.
Judgment shall enter in favor of the plaintiff against the defendant in the amount of $10,000. Judgment shall enter in favor of the plaintiff on the defendant's counterclaim.
The plaintiff shall recover its statutory costs upon application to the clerk.
Beverly J. Hodgson Judge of the Superior Court Complex Litigation Docket